## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LISA MCCANTS,

               **Plaintiff,**

v.

                                        Case No.  16-2787-DDC

CORRECT CARE SOLUTIONS, LLC
and KAY THOMPSON,

               **Defendants.**

_____

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Lisa McCants has sued her former employer and her former supervisor in that job.  The Complaint claims that the employer—defendant Correct Care Solutions, LLC—committed two violations of Title VII.  It also claims that the supervisor—defendant Kay Thompson—is liable for civil battery.  The two defendants have moved for summary judgment against all three claims.  They argue that no reasonable jury could find for plaintiff on any of her claims.

The court has decided to grant Correct Care's motion.  But Kansas law requires it to deny Ms. Thompson's motion.  After identifying the summary judgment facts that govern the two motions, this Order explains how the court reached these conclusions.

### I.    Undisputed Facts

The following facts are uncontroverted or, where controverted, are stated in the light most favorable to plaintiff—the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

***Background***

Correct Care is a private entity who contracts with governmental entities to provide healthcare services to prisoners. On September 8, 2015, plaintiff began working for Correct Care as a Certified Medication Aide at the Wyandotte County Detention Center. In her job, plaintiff distributed medication to prisoners and performed simple medical tasks, like checking inmates' blood pressure. Ms. Thompson is the Health Care Administrator and manages the contract between Correct Care and Wyandotte County, Kansas. As Health Care Administrator, she also manages the staff at Correct Care who work in Wyandotte County.

About a month after plaintiff began working for Correct Care, plaintiff first met Lieutenant Thaxton,[1] a deputy in the Wyandotte County Sheriff's department. The two ran into each other in the hall and introduced themselves. Lieutenant Thaxton acted flirtatiously during this encounter. For the rest of her shift that day, Lieutenant Thaxton appeared in plaintiff's work areas as she made her rounds. Plaintiff informed a couple of Sergeants with the Sheriff's department and two nurses who worked for Correct Care about Lieutenant Thaxton's conduct that day. At some point, she also told Cassandra Dycus, Correct Care's head nurse, about this conduct. But plaintiff cannot recall when she did so.

In October 2015, Ms. Thompson and Lieutenant Thaxton began a casual sexual relationship. This relationship ended a month later when Ms. Thompson ended their relationship. The two never identified themselves as a couple and they remained friends after their sexual interaction ended. Ms. Thompson did not maintain any romantic feelings for Lieutenant Thaxton after their sexual relationship ended.

---

[1]    The summary judgment record does not identify Lieutenant Thaxton's first name.

### *Lieutenant Thaxton asks plaintiff out*

On December 8, 2015, Lieutenant Thaxton came to plaintiff's work area and publicly announced that he was leaving the building just as plaintiff's shift was ending. He then went downstairs, called up to plaintiff's work area and asked to speak with her. Once plaintiff was on the phone, he asked her what color car she was driving and she answered his question. Once they hung up, plaintiff waited a few moments to leave so that a friend could accompany her to the parking lot. Nothing happened in the parking lot. But shortly after she pulled out of the lot, plaintiff saw Lieutenant Thaxton in the car next to her. He signaled that he wanted to speak, so she rolled down her window. He then asked if she could pull over to a side street and plaintiff agreed to do so. Once they were on the side street, Lieutenant Thaxton asked plaintiff out, asked for her number, and told her that if she wanted to, they could have sex. Plaintiff declined. At this point, plaintiff ended the conversation and Lieutenant Thaxton asked for a hug, which plaintiff also declined.

A few days later, plaintiff informed Ms. Thompson about these events but she omitted the part about Lieutenant Thaxton asking her if she wanted to have a sexual relationship with him. After a discussion with Correct Care's human resources department, Ms. Thompson asked plaintiff to describe the encounter in writing. So, on December 13, 2015, plaintiff wrote Ms. Thompson an email memorializing what plaintiff had told Ms. Thompson. After receiving this email, Ms. Thompson spoke with Lieutenant Thaxton about his behavior.

In the days after the December 8 interaction between Lieutenant Thaxton and plaintiff, Lieutenant Thaxton stared at plaintiff on occasion. Plaintiff described these stares as "creepy." He also followed her around the office. On December 19, in response to Lieutenant Thaxton's behavior, plaintiff emailed Ms. Thompson to ask her if she had spoken with Lieutenant

Thaxton's supervisors about his conduct.  Ms. Thompson replied that she had not.  Plaintiff then told Ms. Thompson and Patricia Rice, a member of Correct Care's human resources department, about Lieutenant Thaxton's suggestion of a sexual relationship.  Ms. Rice and Ms. Thompson then decided to inform Lieutenant Thaxton's superiors about his behavior.  After this conversation between plaintiff, Ms. Rice, and Ms. Thompson, plaintiff interacted with Lieutenant Thaxton just once, albeit briefly.  During that exchange, Lieutenant Thaxton asked plaintiff, "How are you doing?"  Doc. 58-4 at 6 (McCants Dep. ("Pl. Dep.") 43:17–21).  And then he said, "Well, I'm just checking on you to make sure that nobody is following you, you know, hounding you." *Id.*

### Ms. Thompson and plaintiff's work relationship deteriorates

On December 20, 2015—the day after plaintiff had sent her follow up email to Ms. Thompson—plaintiff was handing out medication to inmates.  One inmate advised that he did not feel well and asked to have his blood pressure taken.  Plaintiff, who needed to continue distributing medication, asked two nurses if they could take the inmate's blood pressure.  Neither one of them checked the blood pressure.  As a result, Ms. Thompson issued written reprimands to all three.

In December 2015, during a holiday party dinner, Ms. Thompson called plaintiff into her office to deliver a verbal reprimand.  Plaintiff cannot recall why Ms. Thompson reprimanded her. Later that month, Ms. Thompson verbally reprimanded plaintiff for asking a nurse a question that—according to Ms. Thompson—plaintiff should have directed to her.  On December 31, plaintiff's direct supervisor Alisa Butt found plaintiff crying after Ms. Thompson had reprimanded plaintiff for miscounting narcotics medicine.  Ms. Butt sent an email to Ms. Thompson and Julie Lindsey—a human resources employee for Correct Care—to inform them

that she had found plaintiff crying because of Ms. Thompson's reprimand.  Neither Ms. Thompson nor Ms. Lindsey did anything in response to Ms. Butt's email.  Thereafter, Ms. Thompson continued to reprimand plaintiff verbally about various offenses, including oral reprimands based on the condition of the medication room.  Plaintiff also explained that Ms. Thompson would reach over plaintiff to get things she needed without apologizing to her.

### Ms. Thompson bumps into plaintiff

On April 4, 2016, plaintiff was standing in the break room during a meeting.  She was leaning against a counter and there was a table some distance away from her.  While no evidence in the summary judgment record establishes exactly how much room separated plaintiff and the table, it was sufficient room for a person to pass without bumping plaintiff or the table.  But the space was "very narrow," as conceded by plaintiff.  Pl. Dep. 81:16–19.  During the meeting, Ms. Thompson entered the room, looking down at her phone.  While Ms. Thompson still was looking at her phone, her elbow bumped into plaintiff's arm.  *Id.* at 131:18–24.  The two made eye contact after the bump but they exchanged no words with one another.

The admissible evidence—viewed in plaintiff's favor—explains the character of the contact Ms. Thompson made with plaintiff.  Plaintiff testified that Ms. Thompson bumped her with her left elbow, making contact on the upper part of plaintiff's left arm.  *Id.* at 126:12–127:3.  The contact lasted no longer than a bump requires.  *Id.* at 127:4–7.  The contact did not knock plaintiff off her feet, or even cause her to lose her balance.  *Id.* at 131:2–3.  It didn't cause plaintiff to cry out in pain, make any other sound, or say anything to Ms. Thompson immediately.  *Id.* at 131:4–5; 15–17.  But it did cause plaintiff to change her demeanor, showing a concerned expression.  *Id.* at 131:8–11.

After the meeting ended, plaintiff walked from the break room—where the bumping contact had occurred—to Ms. Thompson's office. From the doorway, plaintiff told Ms. Thompson, "I don't know if you are aware that you bumped me back there, but when I bump someone, I say excuse me." *Id.* at 85:12–16. Plaintiff then waited for Ms. Thompson to respond. *Id.* at 86:2–4. And when she didn't, plaintiff added, "Okay. Excuse you." *Id.* at 86:22–25.

Ms. Thompson responded to this statement, however. Telling plaintiff to have a seat, Ms. Thompson called Ms. Lindsey. Autumn Schultz—another human resources employee for Correct Care—was in Ms. Lindsey's office at the time and she also listened to the call. Ms. Lindsey asked plaintiff to recount what had transpired. While plaintiff described what had happened, Ms. Thompson interjected several times, painting a negative picture of plaintiff and saying that plaintiff's "talk is disrespectful." *Id.* at 89:8–14. When Ms. Lindsey asked if anyone had witnessed this bumping, plaintiff claimed that two people had seen it. Plaintiff never provided their names, however. Ms. Lindsey then instructed Ms. Thompson to let plaintiff go home because her shift had ended.

The next day, April 5, 2016, Ms. Thompson sought approval from Yvette Riker—Correct Care's Regional Vice President—and Colleen Oakes—Correct Care's Regional Manager—to terminate plaintiff's employment. Ms. Thompson recounted plaintiff's behavior for Ms. Riker and Ms. Oakes, describing plaintiff's actions as "very rude" and done in a "disrespectful manner." Doc. 61-4 at 5. Ms. Thompson also asserted that plaintiff had pointed her finger in Ms. Thompson's face. *Id.* Ms. Thompson had not mentioned the finger pointing to Ms. Lindsey and Ms. Schultz the day before. After a conference call between Ms. Thompson, Ms. Riker, Ms. Oakes, and Ms. Lindsey, they decided to terminate plaintiff's employment. A few hours after

that conference call ended, Ms. Dycus, Ms. Thompson, Ms. Lindsey, and Ms. Schultz called

plaintiff to inform her that Correct Care was terminating her employment because she had acted

unprofessionally.

Plaintiff then filed this suit.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine

dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  When applying this standard, the court views the evidence and draws

inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625

F.3d 1279, 1283 (10th Cir. 2010).  A disputed "issue of fact is 'genuine' 'if the evidence is such

that a reasonable factfinder could return a verdict for the non-moving party' on the issue."  *Id.*

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And an "issue of fact is

'material' 'if under the substantive law it is essential to the proper disposition of the claim' or

defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary

judgment and the burden of establishing that summary judgment is appropriate as a matter of

law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v.

Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the

moving party "'need not negate the non-movant's claim, but need only point to an absence of

evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO,

Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "'may not rest upon its

pleadings, but must set forth specific facts showing a genuine issue for trial [on] those dispositive

matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. To demonstrate that specific facts present a genuine dispute for trial, "the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)). So, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it is an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Analysis

Part A of this section considers plaintiff's two Title VII claims. Section 1 addresses Count II's claim of a sexually hostile work environment. Section 2 decides Count III's claim for retaliation. Part B then takes up Count IV's claim for civil battery.[2]

As already explained, the court has decided to grant summary judgment against the two federal claims. But it concludes that the state law claim requires a trial. Because these conclusions leave the state law cause of action as the only claim, the court, in its discretion, declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c). Instead, the court

---

[2]    The Complaint additionally asserted a breach of employment contract claim against Correct Care (Count I) and an assault claim against Ms. Thompson (Count IV). But plaintiff abandoned these claims at the pretrial conference. Doc. 56 ¶ 4.a.

remands the remainder of the case to the District Court of Wyandotte County, Kansas—the forum where plaintiff initiated this suit before defendant removed the case to our court.

**A.    Title VII**

**1.  Hostile Work Environment**

Under Title VII, an employer incurs liability for an employee's sexual harassment when it is sufficiently severe or pervasive that a reasonable person would find the work environment hostile or abusive and the employee, in fact, perceived it to be so.  *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 650 (10th Cir. 2013) (citations omitted).  Correct Care argues that it deserves summary judgment against this claim for two independent reasons:  first, plaintiff has abandoned this claim; and second, no reasonable jury could find that Correct Care responded inadequately to plaintiff's complaint of harassment.

Turning to Correct Care's first argument, when a party fails to respond to arguments made to support a motion for summary judgment, the party, in effect, abandons that claim.  *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court's dismissal of plaintiff's equal protection claim after it concluded that plaintiff had abandoned the claim because he had not addressed it in his memorandum opposing summary judgment); *see also C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1337 (D. Kan. 2008) (concluding that plaintiff had abandoned his retaliation claim by not responding to defendant's motion for summary judgment against the claim).  Here, plaintiff's Response to Correct Care's Motion for Summary Judgment never addresses Correct Care's arguments that it deserves summary judgment against her hostile work environment claim.  Plaintiff therefore has abandoned her claim.  The court thus grants summary judgment against plaintiff's hostile work environment claim.

The court grants summary judgment against this claim for a second, independent reason. Namely, no reasonable jury could conclude that Correct Care's response to plaintiff's lone complaint to her employer was inadequate. The governing law permits an employer to avoid liability under Title VII by showing that its response to alleged harassment reported to the employer was "'reasonably calculated to end the harassment.'" *Adler*, 144 F.3d at 676 (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)). Also, when the summary judgment facts establish that the employer responded to the plaintiff's complaint and the harassment stopped, it "shows effectiveness which in turn evidences such reasonable calculation." *Id.*

Here, the summary judgment facts establish that the alleged perpetrator of sexual harassment—a Lieutenant Thaxton—interacted with plaintiff just once after plaintiff informed Correct Care about the full extent of his conduct. This interaction with Lieutenant Thaxton was brief, consisting merely of him asking plaintiff "How are you doing?" and adding "Well, I'm just checking on you to make sure that nobody is following you, you know, hounding you." Pl. Dep. 43:17–21. No reasonable jury could conclude from these undisputed facts, even when viewed in plaintiff's favor, that this exchange amounted to new harassment.

In sum, the summary judgment facts establish that Correct Care intervened in a fashion that effectively ended the harassment. This means Correct Care's response to plaintiff's complaint was reasonably calculated to end the harassment. *See MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005) (holding that a district court properly granted summary judgment against a hostile work environment claim because, in part, the harassing employee made no more inappropriate comments). The court thus grants summary judgment against plaintiff's hostile work environment claim for this additional reason.

### 2.  Retaliation

The court now considers Correct Care's motion for summary judgment against plaintiff's retaliation claim.

Federal law prohibits an employer from retaliating against an employee who reports illegal discrimination.  42 U.S.C. § 2000e-3(a).  When plaintiff adduces no direct evidence of retaliation—as is the case here—courts apply the *McDonnell Douglas* burden-shifting framework to such claims.  *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016).  To succeed under this framework on a claim that an employer has retaliated against an employee for reporting discrimination, the employee must first establish "(1) 'that [she] engaged in protected opposition to discrimination,' (2) 'that a reasonable employee would have found the challenged action materially adverse,' and (3) 'that a causal connection exists between the protected activity and the materially adverse action.'"  *Id.* (quoting *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007)).

If the employee can establish all three requirements, the burden then shifts to the employer.  The employer must provide a "'legitimate, non-retaliatory rationale for the adverse employment action.'"  *Id.* (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015)).  If the employer does so, the burden shifts back to the employee who must show that the employer's proffered rationale is pretextual.  *Id.*

Here, plaintiff identifies four actions taken by Correct Care that allegedly constitute retaliation:  (a) the December 20 discipline against plaintiff for failing to take an inmate's blood pressure, (b) Ms. Thompson's harassment of plaintiff, (c) the "break room bump," and (d) the termination of plaintiff's employment.  Correct Care argues that it cannot be held liable for these actions for two distinct reasons.  First, it argues that no reasonable jury could conclude that

11

plaintiff engaged in protected activity because plaintiff complained only about an isolated incident of sexual harassment. Second, and as a matter of law, Correct Care argues that none of the four actions that plaintiff identifies can support a retaliation claim.

The court assumes, without deciding, that plaintiff engaged in protected activity when she reported Lieutenant Thaxton's comments. But the court grants summary judgment against plaintiff's retaliation claim nonetheless because the summary judgment facts are insufficient to support a retaliation claim. The following four subsections explain why no reasonable jury could conclude that these incidents constitute impermissible retaliation.

### a. December 20 Discipline

The first incident that plaintiff specifies as illegal retaliation is a written warning plaintiff received on December 20, 2015. That day, plaintiff was handing out medicine to inmates when one inmate asked her to take his blood pressure. Plaintiff concluded she was too busy to respond immediately, so she asked two nurses to check the inmate's blood pressure. The two nurses failed to take the inmate's blood pressure, so Ms. Thompson issued a formal written warning to all three of them. Correct Care concedes, for the purposes of its motion, that a reasonable jury could conclude that this discipline constituted materially adverse action and that a causal link exists between plaintiff's protected activity and this discipline. So, for the purposes of summary judgment, Correct Care concedes that a reasonable jury could find plaintiff had carried her initial burden. But Correct Care argues that it had a legitimate, non-pretextual reason for handing out this discipline: because plaintiff and the other two nurses didn't do their job and take the inmate's blood pressure. Doc. 58-7 (Thompson Decl.) ¶¶ 8, 10. By articulating this justification for disciplining plaintiff, Correct Care shifts the burden to plaintiff to show that "the proffered rationale is pretextual." *Hansen*, 844 F.3d at 925.

A plaintiff can show that an employer's proffered legitimate reason for taking materially adverse action is pretextual "by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'"  *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (first quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013); then quoting *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016)).  If the summary judgment facts establish "'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable [jury] could deem the employer's reason unworthy of credence,'" then summary judgment is not appropriate.  *Id.* (quoting *Tabor*, 703 F.3d at 1216).

But the court is mindful that it "'may not second guess the business judgment of the employer.'"  *Id.* (quoting *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017)).  So, an employer who made a mistake or used poor business judgment when it took materially adverse action against an employee does not necessarily incur liability for retaliation.  *Id.*  "'In determining whether the proffered reason for a decision was pretextual, [the courts] examine the facts as they appear *to the person making the decision*,' and 'do not look to the plaintiff's subjective evaluation of the situation.'"  *Id.* (quoting *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011)).  Likewise, federal courts "do not ask 'whether the employer's proffered reasons were wise, fair or correct;' [courts] ask only 'whether the employer honestly believed those reasons and acted in good faith upon those beliefs.'"  *Debord*, 737 F.3d at 655 (quoting *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011)).

Plaintiff argues that she has carried this burden at summary judgment because she has marshaled admissible evidence that Correct Care's reason is pretextual.  She claims:  (1) Correct Care knew that plaintiff asked two other nurses to check the inmate's blood pressure because she

was busy; (2) Correct Care has not offered a copy of any written warnings issued for this misconduct as part of the summary judgment record; (3) Correct Care never explains why it disciplined the other two nurses; and (4) Correct Care never explains why plaintiff should have stopped distributing medicine to take an inmate's blood pressure.  Doc. 61 at 66–67.

None of these arguments provide a basis for a reasonable jury to conclude that Correct Care's reason contains "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions."  *DePaula*, 859 F.3d at 970.  Simply put, plaintiff provides no basis for a jury to find that this explanation is unworthy of belief.  And notably, plaintiff never claims that she took the inmate's blood pressure.  Indeed, she admits that she didn't.  Pl. Dep. 62:8–17; *see also Hall v. Interstate Brands Corp.*, 395 F. App'x 519, 522 (10th Cir. 2010) (holding that plaintiff failed to establish pretext at summary judgment when he admitted to his workplace misconduct).  While plaintiff may view Correct Care's decision as unfair or unjust, Congress didn't intend for Title VII to remedy unfair workplaces.  *See Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir. 1993) ("Title VII is not violated by the exercise of erroneous or even illogical business judgment.").  No reasonable jury could find Correct Care's reason for disciplining plaintiff was pretextual.  So, this adverse action will not permit the retaliation claim to go forward.

### b.  Ms. Thompson's "Harassment"

Next, plaintiff claims that Correct Care—through Ms. Thompson—retaliated by harassing her after she complained about Lieutenant Thaxton's behavior.  This form of alleged retaliation focuses on four discrete actions.  Specifically, plaintiff asserts that Ms. Thompson: (1) called plaintiff to her office while she was eating during a holiday dinner party to deliver a verbal reprimand, (2) verbally reprimanded plaintiff for asking a nurse a question, (3) constantly reprimanded plaintiff verbally for the condition of the medication room, and (4) generally spoke

loudly to plaintiff and reached over plaintiff. Doc. 61 at 50–51. No reasonable jury could conclude that these acts, individually or collectively, constituted materially adverse employment action.

When a plaintiff makes a retaliation claim, an employment action qualifies as "materially adverse" when it would dissuade a reasonable employee from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). To satisfy the "materially adverse" requirement, plaintiff need not "prove some tangible, subjective psychological or monetary injury." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007). But plaintiff must show something more than "petty slights, minor annoyances, and simple lack of good manners . . . ." *Id.* As the Supreme Court has explained, Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Here, no reasonable jury could conclude that Ms. Thompson's verbal reprimands—the basis of plaintiff's first three complaints of harassment—constitute materially adverse actions because these warnings had no affect on plaintiff's job. Minor discipline that alters none of the conditions of employment cannot qualify as materially adverse action. *See Steele v. Kroenke Sports Enters., L.L.C.*, 264 F. App'x 735, 746 (10th Cir. 2008) (holding that no reasonable jury could conclude that a verbal warning without evidence of further discipline constituted materially adverse action); *see also Cuenca v. Univ. of Kan.*, 265 F. Supp. 2d 1191, 1209 (D. Kan. 2003) ("'Unsubstantiated oral reprimands and unnecessary derogatory comments . . . are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status.'" (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 533 (10th Cir. 1998))), *aff'd*, 101 F. App'x 782 (10th Cir. 2004). A reasonable jury could not

conclude that Ms. Thompson's verbal reprimands of plaintiff would dissuade a reasonable employee from reporting illegal discrimination.

Plaintiff's last complaint—that Ms. Thompson yelled at her and reached over her—amounts to nothing more than a "simple lack of good manners . . . ." *Williams*, 497 F.3d at 1090; *see also Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (affirming a district court's grant of summary judgment against a Title VII retaliation claim where plaintiff alleged that his superior stared and yelled at him because that conduct could not constitute materially adverse action). Speaking too loudly, interrupting a co-worker's meal during an office holiday gathering, and reaching over a co-worker hardly manifest good manners or social grace. But no reasonable jury could find such behavior sufficient to dissuade an employee from reporting illegal discrimination. None of Ms. Thompson's "harassment," even when added together, can suffice to support a retaliation claim.

### c. The Break Room Bump

Next, plaintiff argues that a reasonable jury could conclude that Correct Care retaliated against her when Ms. Thompson bumped into plaintiff in the break room. Again, to survive summary judgment, plaintiff must demonstrate that a reasonable jury could find that this allegedly retaliatory act would dissuade a reasonable employee from reporting illegal workplace discrimination. *Burlington*, 548 U.S. at 68.

To place a finer point on the summary judgment question this theory presents, the court returns to plaintiff's own description of the bump. Plaintiff contends that she was standing in the break room during a meeting. Pl. Dep. 81:16–19. In the middle of the meeting, Ms. Thompson entered the room while looking down at her phone. *Id.* at 131:18–22. As she was looking at her phone, Ms. Thompson's left elbow bumped plaintiff's left arm. *Id.* at 130:20–23; 131:18–22.

This contact did not cause the rest of plaintiff's body to move at all. *Id.* at 130:20–23. It caused no physical damage; plaintiff's arm was not bruised and did not bleed. *Id.* at 154:14–21. Could a reasonable jury find that a reasonable employee would refrain from reporting illegal discrimination for fear that her employer might commission one of its representatives to bump plaintiff in this fashion? This question answers itself. No reasonable jury could find such conduct is adverse enough to dissuade such reporting. This theory of retaliation will not avert summary judgment.

### d. Plaintiff's Termination

Finally, plaintiff argues that a reasonable jury could conclude that the termination of her employment constituted retaliation. Correct Care concedes for the purposes of this motion that plaintiff's termination was a materially adverse action. Instead, Correct Care's summary judgment motion argues that no reasonable jury could conclude that (1) it terminated plaintiff's employment because of her protected activity; or (2) that its neutral, non-retaliatory reasons for terminating her employment were pretextual. The court assumes, without deciding, that a reasonable jury could conclude that the summary judgment facts establish a causal link between plaintiff's protected activity and Correct Care terminating her employment. But it grants summary judgment nonetheless because no reasonable jury could find that Correct Care's reason for terminating her employment was pretextual.

As explained above, a plaintiff can demonstrate a triable issue whether an employer's reason for taking materially adverse action is pretextual "'by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable [jury] could deem the employer's reason unworthy of credence.'" *DePaula*, 859 F.3d at 970 (quoting *Tabor*, 703 F.3d at 1216). "'In determining whether the

proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*,' and 'do not look to the plaintiff's subjective evaluation of the situation.'" *Id.* (quoting *C.R. Eng.*, 644 F.3d at 1044).  Courts "do not ask whether the employer's proffered reasons were wise, fair or correct; [courts] ask only whether the employer honestly believed those reasons and acted in good faith upon those beliefs."  *Debord*, 737 F.3d at 655 (internal citation and quotation omitted).

Correct Care has explained that it terminated plaintiff's employment because she was insubordinate and unprofessional when she told Ms. Thompson, "I don't know if you are aware that you bumped me back there, but when I bump someone, I say excuse me," and then concluded by saying "Okay.  Excuse you."  Doc. 58 at 26.  The court agrees such insubordination and unprofessionalism are legitimate, non-retaliatory reasons for her discharge. *See Lawson v. Potter*, 463 F. Supp. 2d 1270, 1285–86 (D. Kan. 2006) (finding that "unprofessional" and "insubordinate" behavior are legitimate reasons to suspend an employee). Recognizing her duty to adduce evidence presenting a triable issue of pretext, plaintiff offers three responses.

First, she argues that she never demanded Ms. Thompson apologize, contrary to what defendant asserts in its Memorandum in Support of its Motion for Summary Judgment.  In its Memorandum in Support, Correct Care argues that it could terminate plaintiff's employment because she walked into Ms. Thompson's office and demanded an apology.  *Id.*  Plaintiff argues that this reason is pretextual because (1) she never demanded an apology explicitly and (2) Correct Care never asserted this demand as a reason for terminating plaintiff's employment until now.  But Correct Care adding this fact—even if untrue—is not enough for a reasonable jury to conclude that Correct Care's reason is pretextual.  To be sure, post-hoc justifications which differ

from the employer's initial explanation and are unsupported by evidence can lead a reasonable jury to believe that the employer's reasons are pretextual. *Matthews v. Euronet Worldwide, Inc.*, 271 F. App'x 770, 773 (10th Cir. 2008). But no reasonable jury can conclude that an employer's reasons are pretextual merely because the employer elaborates to explain its initial justification. *Id.* at 774.

Here, Correct Care merely elaborated about its reason for the termination decision. While the summary judgment facts establish that plaintiff never demanded an apology explicitly, no reasonable jury could conclude that Correct Care's elaboration in its summary judgment papers constitutes a weakness, implausibility, inconsistency, incoherence, or contradiction in its reasons for termination. Correct Care simply characterized what it had perceived plaintiff was doing: demanding an apology from her supervisor. No reasonable jury could find that this description shows pretext.

Second, plaintiff argues that a reasonable jury could find pretext because Correct Care added the description of plaintiff's conduct as "insubordinate" for the first time in its Memorandum in Support. Initially, Correct Care told plaintiff that it was terminating her employment because of her "unprofessional" behavior. Doc. 61-5 at 2. In its memorandum in support, Correct Care asserted that plaintiff's behavior "qualif[ies] as unprofessionalism *and insubordination* . . . ." Doc. 58 at 26 (emphasis added). Plaintiff argues that Correct Care's newly added reason—"insubordination"—could allow a reasonable jury to conclude that Correct Care's initial reason—"unprofessionalism"—was pretextual. But this is just another elaboration because "insubordination" is closely related to "unprofessional behavior." *See Lawson*, 463 F. Supp. 2d at 1286 (using "unprofessional" and "insubordinate" together to describe the same

behavior). Correct Care's additional characterization of plaintiff's behavior as "insubordinate" will not allow a reasonable jury to conclude that Correct Care's reasons are pretextual.

Finally, plaintiff argues that a reasonable jury could find pretext because Ms. Thompson falsely added that plaintiff pointed her finger at her in an email Ms. Thompson wrote describing what had occurred on April 4, 2016. Plaintiff asserts she used this email to persuade Correct Care to terminate plaintiff's employment. On April 4, 2016, when Ms. Thompson first described plaintiff's actions to Correct Care's human resources representative over the phone, she did not mention that plaintiff had pointed a finger in her face. *See* Doc. 61-5 at 2; Doc. 61-6 at 2. The next day, Ms. Thompson sent an email to the human resources department where she said that plaintiff pointed her finger in Ms. Thompson's face in a rude and disrespectful manner. Doc. 61-4 at 5. This added detail—even if completely fabricated—could not undermine the gravamen of Correct Care's expressed reason for terminating plaintiff's employment, *i.e.*, walking into her supervisor's office and chastising the supervisor's behavior. This added fact is merely an elaboration and no reasonable jury could conclude that this evidences a weakness, inconsistency, or contradiction in Correct Care's reason for termination.[3]

Because the summary judgment facts do not provide a basis for a reasonable jury to find that Correct Care retaliated against plaintiff, the court enters summary judgment against plaintiff's retaliation claim.

---

[3]    Correct Care also argues that it cannot be liable for terminating plaintiff's employment because Ms. Riker and Ms. Oakes—not Ms. Thompson—decided to terminate plaintiff's employment and they held no discriminatory animus toward plaintiff. Plaintiff argues that this reason is insufficient to nullify her theory because they relied on Ms. Thompson's recommendation without independently investigating her claims. Because the court has concluded that no reasonable jury could conclude that Correct Care's reason for termination was pretextual, the court declines to address this argument.

###### B.    Civil Battery Claim

Count IV of the Complaint asserts a claim for civil battery against Ms. Thompson.  The battery alleged by Count IV occurred in Kansas[4] where the elements of a civil battery claim require plaintiff to establish "the unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact or an apprehension of contact that is harmful or offensive."  *McElhaney v. Thomas*, 405 P.3d 1214, 1219 (Kan. 2017).  In abbreviated fashion, plaintiff alleges that Ms. Thompson is liable for this intentional tort because she intentionally used her elbow to make contact with her.  Twice our court has decided whether similar battery claims should survive summary judgment.  But less than six months ago, the Kansas Supreme Court clarified what constitutes battery under Kansas law.  The court first addresses how this court previously analyzed battery claims and then explains how the recent Kansas Supreme Court decision brings a new perspective to the analysis.  The court then applies the law as modified by this recent supreme court decision to the summary judgment facts presented here.

###### 1.    Previous rulings by this court

In 1998, Judge Lungstrum considered a battery claim where plaintiff asserted that the defendant had tapped him on the shoulder with a rolled-up piece of paper; this claim also asserted that the defendant had placed his hands on plaintiff's shoulders several times without permission.  *Holdren v. Gen. Motors Corps.*, 31 F. Supp. 2d 1279, 1286 (D. Kan. 1998).  Judge

---

[4]        "In a diversity action, [courts] apply the choice of law rules of the forum state."  *Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014).  "This rule also applies when a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit"—as is the case here.  *BancOklahoma Mtg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (quoting *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996)).  Kansas is the forum state, and its law applies the "law of the 'place of the wrong'" to tort claims.  *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1455 (D. Kan. 1995) (citing *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985)).  Here, the place of the wrong is the Correct Care break room in Wyandotte County, Kansas.  So, Kansas law applies to plaintiff's battery claim.

Lungstrum held that no reasonable jury could find the contact offensive enough to support a battery claim. *Id.* at 1287. He reasoned that a reasonable jury could not conclude that defendant intended for these greetings—which were typical in the American workplace—to be offensive. *Id.* at 1286–87. And the summary judgment record provided no indication that defendant was ever "angry, upset[,] or rude" while tapping plaintiff on his shoulder or placing his hand on plaintiff's shoulder. *Id.* at 1287 (citing *Stricklin v. Parsons Stockyard Co.*, 388 P.2d 824 (Kan. 1964)). So, Judge Lungstrum granted summary judgment against this claim.

More recently, in 2012, Judge Crow granted summary judgment against a battery claim that relied on similarly mild physical contact. *Debord v. Mercy Health Sys. of Kan., Inc.*, 860 F. Supp. 2d 1263, 1279 (D. Kan. 2012). In that case, plaintiff claimed the defendant had hugged her in an attempt to console her. *Id.* at 1277–78. Judge Crow held that no reasonable jury could find that defendant intended to harm plaintiff physically or offend plaintiff with this hug. *Id.* at 1279 (citing *Stricklin*, 388 P.2d 824). Like Judge Lungstrum, Judge Crow noted that the summary judgment record in his case contained no facts indicating defendant meant to harm or offend plaintiff by hugging her. *Id.* He therefore granted summary judgment against plaintiff's battery claim.

These two rulings do not augur well for plaintiff's battery claim here. But in 2017, the Kansas Supreme Court decided to revisit the formulation for battery claims under Kansas law. Because the *Erie* doctrine obligates the court to follow the decisions of a state's highest court when deciding state law claims, the court must consider how, if at all, this new decision changes the court's analysis from the ones in *Holdren* and *Debord*. *See Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) ("'When the federal courts are called upon to

22

interpret state law, the federal court must look to rulings of the highest state court . . . .'" (quoting *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007))).

### 2.    Kansas Supreme Court's ruling in *McElhaney v. Thomas*

Late last year, the Kansas Supreme Court decided *McElhaney v. Thomas*, 405 P.3d 1214 (Kan. 2017). It reversed a trial court's ruling refusing to submit a battery claim to a jury. *Id.* at 1216. The gravamen of the trial court's rationale for its ruling was this: "'I believe the law in the State of Kansas is that not only must there be—for an intentional tort not only must there be a battery, but there also must be an intent to injure . . . I'm not going to allow the jury to decide the intentional tort. I believe [defendant's intentional conduct was] simply horseplay. . . .'" *Id.* at 1217–18 (quoting trial judge's ruling). The Kansas Court of Appeals affirmed the trial court's ruling, reasoning that plaintiff had failed to allege defendant "intended to physically injure [plaintiff] or cause bodily harm" and so, whether viewed under the judgment on the pleadings or summary judgment standard, defendant "was entitled to prevail on [the] battery claim as a matter of law." *Id.* at 1218 (citing *McElhaney v. Thomas*, 353 P.3d 470, 2015 WL 4486791, at *3, *6 (Kan. Ct. App. July 17, 2015) (unpublished table decision)). The appeals court reached this conclusion by relying on *Stricklin*, where the Kansas Supreme Court had held that a defendant— to be subject to liability for battery—must have had an "intent to cause injury." *Id.* (citing *Stricklin*, 388 P.2d at 829). And "injury," *Stricklin* said, meant physical injury. *Id.*

The Kansas Supreme Court then granted plaintiff's petition for review and Justice Stegall delivered the court's opinion. His thoughtful and careful analysis began by reviewing several benchmark decisions by the Kansas Supreme Court—decisions followed by the trial court and court of appeals. *See id.* at 1219–20. *Stricklin* featured prominently in this section of Justice Stegall's analysis. *Id.*

In *Stricklin*, defendant—known for playing practical jokes—grabbed plaintiff's feet while plaintiff was sitting on the fence of a cattle pen. *Stricklin*, 388 P.2d at 825. Defendant then lifted plaintiff up, which caused plaintiff to lose his balance and fall six feet onto a concrete floor. *Id.* Plaintiff sustained serious injuries. *Id.* He sued defendant on a negligence theory because he filed his lawsuit after the statute of limitations for a battery claim had expired. *Id.* at 826–27. Defendant moved to dismiss the case, arguing that plaintiff, in essence, had asserted a battery claim and thus the statute of limitations barred his claim. *Id.* at 828. The Kansas Supreme Court rejected the defendant's argument, finding that plaintiff had not brought a battery claim because his Complaint never alleged that defendant intended to injure plaintiff physically. *Id.* at 829. Instead, *Stricklin* reasoned, defendant's conduct was "nothing more than horseplay." *Id.*

Justice Stegall did not fault the lower courts for relying on *Stricklin* and its progeny. *McElhaney*, 405 P.3d at 1220. But he wrote that the Kansas Supreme Court was seizing "this opportunity to correct an error in our prior caselaw." *Id.* Justice Stegall identified this correction with this observation: "the precise nature of the injurious intent necessary to sustain a battery claim must be understood in light of the personal interests protected by the common law tort of battery." *Id. McElhaney* then cited two leading scholars at length:

> The original purpose of the courts in providing the action for battery undoubtedly was to keep the peace by affording a substitute for private retribution. The element of personal indignity involved always has been given considerable weight. Consequently, the defendant is liable not only for contacts which do actual physical harm, but also for those relatively trivial ones which are merely offensive and insulting. Spitting in the face is a battery, as is forcibly removing the plaintiff's hat, or any other contact brought about in a rude and insolent manner.

> The defendant may be liable when intending only a joke. The plaintiff is entitled to protection according to the usages of decent society, and offensive contacts, or those which are contrary to all good manners, need not be tolerated. At the same time, in a crowded world, a certain amount of personal contact is inevitable, and must be accepted.

*Id.* (alterations omitted) (citing Prosser and Keeton on Torts § 9, 41–42 (5th ed. 1984)).

24

Justice Stegall's analysis then continued by noting that the Restatement "expressly defines two separate categories of injurious intent." *Id.* (citing Restatement (Second) of Torts (1965)). The first is the intent to do actual physical or bodily harm. *Id.* Kansas had recognized that type of intent in *Stricklin*. But a second form of "alternative injurious intent" also will support tort liability—a form *Stricklin* had disavowed but *McElhaney* now embraced: "when the actor intends to cause an 'offensive contact'" and such contact with another "directly or indirectly results" from that intent. *Id.* (citing Restatement (Second) of Torts § 19). Justice Stegall then defined the requisite degree of offensiveness as "[a] bodily contact [that] offends a reasonable sense of personal dignity." *Id.*

So, *McElhaney* established new practical markers that Kansas state courts—and federal courts applying Kansas law—must use to decide the legal sufficiency of a battery claim:

> The "intent to injure" element of a civil battery claim can be satisfied in alternative ways—either by (1) an intent to cause a harmful bodily contact, that is, to cause the other physical injury; or by (2) an intent to cause an offensive bodily contact, that is, to invade the other's reasonable sense of personal dignity. Both states of mind are sufficiently culpable to justify imposing civil battery liability for damages, including any actual physical injury that is legally caused by the resulting bodily contact.

*Id.* at 1221.

### 3. Applying *McElhaney* to this case's summary judgment facts

The court now turns to Ms. Thompson's arguments in support of summary judgment here. For the most part, Ms. Thompson's summary judgment motion argues that no reasonable jury could find she had the requisite intent to commit battery. Specifically, she argues that the summary judgment record lacks any evidence capable of supporting an inference that she intended to contact plaintiff. And, even if such evidence existed, no admissible evidence establishes that she intended to offend plaintiff with her contact. Certainly, a reasonable jury might draw the same inference as Ms. Thompson does from these facts. After all, according to

plaintiff, Ms. Thompson was looking at her phone as she passed through the crowded room where she made contact with plaintiff.  Pl. Dep. 125:2–6.  And she continued to look at her phone until her elbow contacted plaintiff's arm.  *Id.* at 131:18–22.  But a reasonable jury also might find that Ms. Thompson was using her phone as a prop to disguise her real intent—to make offensive contact with the plaintiff.  Indeed, plaintiff testified that there was plenty of room for a person to pass by without bumping her.  *Id.* at 129:17–19.  And the record is replete with admissible evidence about the hostility the two women had developed for one another by this point in their relationship.

Ms. Thompson constantly reprimanded plaintiff for every misstep she made.  She regularly reached over plaintiff to get things she needed without apologizing.  Also, a reasonable jury could interpret the events that followed the physical interaction to corroborate that Ms. Thompson intentionally initiated her muted confrontation with plaintiff.  When plaintiff went to Ms. Thompson's office to confront her about the bump, Ms. Thompson did not respond by expressing surprise that plaintiff was offended or otherwise maintain that the contact was accidental.  Instead, Ms. Thompson immediately called Correct Care's HR department to report plaintiff's behavior.  The next day, Ms. Thompson contacted a Regional Vice President of their company and secured permission to terminate plaintiff's employment.  These circumstances, taken together, could support a reasonable inference that Ms. Thompson's contact with plaintiff was intentional, and that she intended that contact to offend plaintiff's "reasonable sense of personal dignity."  *McElhaney*, 405 P.3d at 1221.

For the court, the more difficult proposition is whether this bumping was sufficiently "harmful or offensive" to support a civil battery claim.  *Id.* at 1219.  It fails the first of these two alternatives.  No admissible evidence suggests that Ms. Thompson caused plaintiff to sustain

"harmful bodily contact, that is, to cause the [plaintiff] physical injury." *Id.* at 1221.  So, the dispositive question is whether Ms. Thompson's conduct satisfies the second alternative— "offensive bodily contact, that is, to invade the other's reasonable sense of personal dignity."  *Id.* Ms. Thompson's contact with plaintiff falls well shy of some conduct that Kansas law recognizes as sufficient to support a battery claim, *i.e.*, spitting in another's face or trying to bump another person with the bumper of a vehicle.  *Id.* at 1220.  But *McElhaney* also recognized that far less invasive conduct could satisfy this element of a battery claim, *i.e.,* forcibly removing another person's hat.  *Id.*

While it's a close call, the court concludes that plaintiff has sustained her summary judgment burden.  Viewing the facts in the light most favorable to plaintiff, a reasonable jury could find that Ms. Thompson's bumping of plaintiff is the kind of offensive contact that is "contrary to all good manners," and so it "need not be tolerated."  *Id.* at 1220.  It exceeds the kind of incidental contact that "in a crowded world . . . is inevitable."  *Id.* (citing Prosser and Keeton on Torts § 9, 41–42).  Moreover, permitting this claim to proceed to trial is consistent with the "original purpose of the courts in providing the [cause of] action for battery," that is, to "keep the peace by affording a substitute for private retribution" between persons who have made physical contact with one another.  *Id.*  While judges and juries usually devote their time to more substantial disputes, Kansas law entitles plaintiff to present her grievances to a jury of her peers.

The court thus concludes that Ms. Thompson is not entitled to summary judgment against Count IV's battery claim.  So, it denies her motion.

### 4.  Remand to state court

While plaintiff's battery claim survives for trial, this court will not preside over it.  As explained above, Correct Care is entitled to summary judgment against all plaintiff's federal claims, leaving only the state law battery claim for disposition.  Under 28 U.S.C. § 1367(c), the court may decline to exercise supplemental jurisdiction over state law claims when "the district court has dismissed all claims over which it has original jurisdiction," *i.e.*, federal law claims.  Indeed, the Tenth Circuit has expressed the preference that district courts decline jurisdiction over state law claims once it dismisses all federal claims.  *See Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)).  The Supreme Court has directed district courts, when deciding whether to maintain jurisdiction over state law claims, to consider "the values of judicial economy, convenience, fairness, and comity . . . ."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

These factors favor remanding this case back to state court.  Remanding this case back to state court will not waste judicial resources because discovery is complete and the case is trial ready.  *See Koch v. City of Del City*, No. CIV-07-371-D, 2010 WL 1329819, at *13 (W.D. Okla. Mar. 29, 2010) (remanding a removed case after the court entered summary judgment against plaintiff's federal law claims but denied the motion against the state law claims because little judicial economy would be wasted).  And Kansas state courts provide the same level of convenience and fairness as the federal courts.  The last consideration—comity—strongly favors remand.  Kansas state courts have a strong interest in deciding matters involving purely state law claims—like battery.  *See Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) ("'[N]otions

of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'" (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)). Because all the factors favor remand and there is no compelling reason to the contrary, the court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claim and remands this case to Wyandotte County District Court for all future proceedings on that state law claim.[5]

## IV.    Conclusion

For reasons explained above, the court grants Correct Care's Motion for Summary Judgment (Doc. 57). But it denies Ms. Thompson's Motion for Summary Judgment (Doc. 59). Because the court dismisses all plaintiff's federal claims, the court remands this case to Wyandotte County District Court to determine the merits of plaintiff's battery claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Correct Care's Motion for Summary Judgment (Doc. 57) is granted.

**IT IS FURTHER ORDERED THAT** Ms. Thompson's Motion for Summary Judgment (Doc. 59) is denied.

**IT IS FURTHER ORDERED** that this case is remanded to Wyandotte County District Court for trial on plaintiff's battery claim against Ms. Thompson.

---

[5]    Remanding the state law claim back to state court will not deprive plaintiff of her right to appeal the court's decision granting summary judgment against her Title VII claims. *See Koch v. City of Del City*, 660 F.3d 1228, 1236 (10th Cir. 2011) ("'Federal appeals courts have consistently held that they have jurisdiction to review a district court order dismissing federal claims on the merits where the district court subsequently exercised its discretion under 28 U.S.C. § 1367 to remand supplemental state law claims to state court.'" (internal alterations omitted) (quoting *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1209 n.1 (10th Cir. 2000))).

**IT IS SO ORDERED.**

**Dated this 31st day of May, 2018, at Topeka, Kansas.**


<u>s/ Daniel D. Crabtree</u>
Daniel D. Crabtree
United States District Judge